Slip Op. 20-64

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CHANGZHOU TRINA SOLAR ENERGY CO., LTD. ET AL., | |
| **Plaintiffs and Consolidated Plaintiffs,** | |
| and | |
| JA SOLAR TECHNOLOGY YANGZHOU CO., LTD. ET AL., | |
| **Plaintiff-Intervenors,** | Before: Claire R. Kelly, Judge |
| v. | Consol. Court No. 18-00176 PUBLIC VERSION |
| UNITED STATES, | |
| **Defendant,** | |
| and | |
| SOLARWORLD AMERICAS, INC. ET AL., | |
| **Defendant-Intervenor and Consolidated Defendant-Intervenors.** | |

### OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final determination in the fourth administrative review of crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.]

Dated: May 13, 2020

Jonathan Michael Freed, Trade Pacific, PLLC, of Washington, DC, argued for plaintiff, defendant-intervenor, and consolidated defendant-intervenor Changzhou

Trina Solar Energy Co., Ltd., and plaintiffs Trina Solar (Changzhou) Science & Technology Co., Ltd. and Trina Solar (U.S.) Inc.  With him on the briefs was <u>Robert George Gosselink</u>.

<u>Jeffrey S. Grimson</u>, Mowry & Grimson, PLLC, of Washington, DC, for consolidated plaintiffs and plaintiff intervenors JA Solar Technology Yangzhou Co., Ltd., Shanghai JA Solar Technology Co., Ltd. and JingAo Solar Co., Ltd.  With him on the briefs were <u>Kristin H. Mowry</u>, <u>Jill A. Cramer</u>, <u>Sarah M. Wyss</u>, and <u>Bryan P. Cenko</u>

<u>Timothy C. Brightbill</u>, Wiley Rein, LLP, of Washington, DC, argued for consolidated plaintiff and defendant-intervenor SolarWorld Americas, Inc.  With him on the briefs were <u>Laura El-Sabaawi</u>, <u>Usha Neelakantan</u>, <u>Stephen J. Obermeier</u>, and <u>Enbar Toledano</u>.

<u>Tara K. Hogan</u>, Assistant Director, argued for defendant.  With her on the brief were <u>Joshua E. Kurland</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, <u>Jeanne E. Davidson</u>, Director, and <u>Joseph H. Hunt</u>, Assistant Attorney General.  Of Counsel on the brief was <u>Mercedes Morno</u>, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.  Also appearing as Of Counsel was <u>Ian A. McInerney</u>, U.S. Department of Commerce, of Washington, DC.

Kelly, Judge:  This consolidated action is before the court on motions for judgment on the agency record filed by Changzhou Trina Solar Energy Co., Ltd., Trina Solar (Changzhou) Science & Technology Co., Ltd., Yancheng Trina Solar Energy Technology Co., Ltd., Changzhou Trina Solar Yabang Energy Co., Ltd., Turpan Trina Solar Energy Co., Ltd., Hubei Trina Solar Energy Co., Ltd., and Trina Solar (Hefei) Science & Technology Co., Ltd., (collectively, "Trina"); JA Solar Technology Yangzhou Co., Ltd., Shanghai JA Solar Technology Co., Ltd. and JingAo Solar Co., Ltd. (collectively, "JA Solar");  and SolarWorld Americas, Inc.

("SolarWorld").[1]  See [Trina's] 56.2 Mot. J. Agency R., Feb. 15, 2019, ECF No. 41;

Consol. Pls.' & Pl.-Intervenors' 56.2 Mot. J. Agency R., Feb. 15, 2019, ECF No. 43;

SolarWorld's Mot. J. Agency. R., Feb. 15, 2019, ECF No. 44.

Trina, JA Solar, and SolarWorld challenge various aspects of the U.S.

Department of Commerce's ("Commerce") final determination in the fourth

administrative review of the antidumping duty ("ADD") order covering crystalline

silicon photovoltaic cells, whether or not assembled into modules ("solar cells" or

"solar panels"), from the People's Republic of China ("PRC" or "China").  See [Trina's]

Memo. Supp. Mot. J. Agency R. Confidential Version, Feb. 15, 2019, ECF No. 42

("Trina's Br."); [JA Solar's] Memo. Supp. 56.2 Mot. J. Agency R., Feb. 15, 2019, ECF

No. 43-1; [SolarWorld's] Memo. Supp. 56.2 Mot. J. Agency R. Revised Confidential

Version, Feb. 15, 2019, ECF No. 45 ("SolarWorld's Br."); see also Crystalline Silicon

Photovoltaic Cells, Whether or Not Assembled Into Modules, From the [PRC], 83 Fed.

Reg. 35,616 (Dep't Commerce July 27, 2018) (final results of [ADD] admin. review

and final determination of no shipments; 2015–2016) ("Final Results") and

accompanying Issues and Decisions Memo. for the [Final Results], A-570-979, (July

11, 2018), ECF No. 36-5 ("Final Decision Memo"); see also Initiation of [ADD] &

Countervailing Duty Admin. Reviews, 82 Fed. Reg. 10,457 (Dep't Commerce Feb. 13,

2017) ("Initiation of Reviews"); Crystalline Silicon Photovoltaic Cells, Whether or Not

---

[1] SolarWorld and Changzhou Trina Solar Energy Co., Ltd. also appear as defendant-intervenors in this consolidated action.

**PUBLIC VERSION**

Assembled Into Modules, From the [PRC], 77 Fed. Reg. 73,018 (Dep't Commerce Dec. 7, 2012) (amended final determination of sales at less than fair value, and [ADD] order) ("ADD Order").

For the reasons that follow, the court sustains Commerce's decisions to include zero quantity Thai import data when calculating surrogate values, derive surrogate financial ratios using KCE's unconsolidated financial statements, and value Trina's nitrogen inputs using Mexican import data.  However, the court remands for further explanation or reconsideration Commerce's refusal to adjust Trina's constructed export price ("U.S. Price") to account for a countervailed subsidy, as well as its reliance on Maersk Line ("Maersk") rate quotes to value Trina's international freight expenses.

## BACKGROUND

On December 7, 2012, Commerce published its determination to issue an ADD order on solar cells from the PRC.  See generally ADD Order.  On February 13, 2017, in response to timely requests, Commerce initiated its fourth administrative review of the ADD Order.  See generally Initiation of Reviews.  Commerce selected Trina as the sole mandatory respondent for individual examination.[2]  See Resp't Selection

---

[2] Canadian Solar Inc. and Canadian Solar (USA) Inc. were also selected for individual examination, but timely withdrew their request for administrative review, and further requested Commerce rescind review of all Canadian Solar entities.  See

(footnote continued)

Memo. [for 2015–2016 ADD Admin. Review], PD 147, bar code 3571565-01 (May 12, 2017);[3] Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the [PRC], 83 Fed. Reg. 1,018 (Dep't Commerce Jan. 9, 2018) (prelim. results of [ADD] admin. review and prelim. determination of no shipments; 2015–2016) ("Prelim. Results") and accompanying Issues and Decisions Memo. for the [Prelim. Results] at 2–3, A-570-979, PD 363, bar code 3657733-01 (Jan. 2, 2018) ("Prelim. Decision Memo").  Commerce considers the PRC to be a nonmarket economy ("NME"); thus, when calculating Trina's dumping margin, Commerce determined the normal value of Trina's merchandise by using prices from a surrogate market economy country to value factors utilized to produce the subject merchandise ("factors of production" or "FOPs").[4] See Section 773(c)(4) of the Tariff Act of 1930, as amended,

---

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the [PRC], 83 Fed. Reg. 1,018 (Dep't Commerce Jan. 9, 2018) (prelim. results of [ADD] admin. review and prelim. determination of no shipments; 2015–2016) ("Prelim. Results") and accompanying Issues and Decisions Memo. for the [Prelim. Results] at 5–6, A-570-979, PD 363, bar code 3657733-01 (Jan. 2, 2018) (citing Letter of Withdrawal at 1–2, PD 133, bar code 3567268-01 (May 1, 2017)); see also 19 C.F.R. § 351.213(d)(1) (2017).

[3] On November 9, 2018, Defendant submitted indices to the public and confidential administrative records underlying Commerce's final determination.  These indices are located on the docket at ECF Nos. 36-4 and 36-2–3, respectively.  All further references in this opinion to administrative record documents are identified by the numbers assigned by Commerce in those indices and preceded by "PD" and "CD" to denote public or confidential documents.

[4] The term "nonmarket economy country" means any foreign country that Commerce determines "does not operate on market principles of cost or pricing structures, so

(footnote continued)

19 U.S.C. § 1677b(c)(4) (2012).[5]  Commerce chose Thailand as the primary surrogate

country.  <u>See</u> Prelim. Decision Memo at 14–17.

For the <u>Prelim. Results</u>, when calculating Trina's dumping margin, Commerce

declined to increase Trina's U.S. Price to account for the 5.46 percent <u>ad valorem</u>

countervailing duty ("CVD") rate it imposed, based on facts available with an adverse

inference, on the subject merchandise in the most recent review of the companion

CVD order ("companion CVD review").  <u>See</u> Prelim. Decision Memo at 30; <u>see also</u>

<u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From</u>

<u>the [PRC]</u>, 82 Fed. Reg. 32,678 (Dep't Commerce July 17, 2017) (final results of [CVD]

admin. review, and partial rescission of [CVD] admin. review; 2014) ("<u>3</u><u>rd</u> <u>CVD AR</u>")

and accompanying Issues and Decisions Memo. for [<u>3</u><u>rd</u> <u>CVD AR</u>] at Cmts. 1–2, C-570-

980,           (July           10,           2017),           <u>available           at</u>

https://enforcement.trade.gov/frn/summary/prc/2017-14957-1.pdf (last visited Apr.

30, 2020) ("3rd CVD AR IDM").[6]  When calculating Trina's ocean freight expenses,

---

that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A). In such cases, Commerce must "determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise . . . [together with other costs and expenses]." <u>Id.</u> § 1677b(c)(1).

[5] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

[6] In the companion CVD review, Commerce based the 5.46 percent CVD rate on a total facts available with an adverse inference finding that the Ex-Im Bank of China's Export Buyer's Credit Program ("Credit Program") was a countervailable subsidy. <u>See</u> Final Decision Memo at 19–20; <u>see also</u> 3rd CVD AR IDM at Cmts. 1–2.

Commerce relied on international freight rates from Maersk, a transportation and logistics company. See Prelim. Decision Memo at 25–26. When calculating Trina's selling, general and administrative ("SG&A") expenses, overhead, and profit, Commerce found that financial statements from three Thai companies—Hana Microelectronics Public Co., Ltd., KCE Electronics Public Company Limited ("KCE"), and Styromatic (Thailand) Co., Ltd. ("Styromatic")—constituted the best available information for deriving surrogate financial ratios. See Prelim. Decision Memo at 26–27. Finally, although Commerce chose Thailand as the primary surrogate country, when valuing Trina's liquid and compressed nitrogen ("nitrogen") FOPs, Commerce relied on Mexican import data—citing concerns that the Thai import data "may not correctly reflect the actual broad market average price for nitrogen in Thailand[.]" Prelim. Surrogate Value Memo. [for 2015–2016 ADD Admin. Review] at 4, PD 364, bar code 3658331-01 (Jan. 2, 2018) ("Prelim. SV Memo"); see also Prelim. Decision Memo at 24 (citing Prelim. SV Memo).

On July 27, 2018, after receiving comments from interested parties, Commerce published its Final Results. See Final Results, 83 Fed. Reg. at 35,616. For the Final Results, as in the Prelim. Results, Commerce declined to increase Trina's U.S. Price to account for the 5.46 percent CVD rate from the companion CVD review. See Prelim. Decision Memo at 30; Final Decision Memo at 17–20; 3rd CVD AR IDM at Cmts. 1–2. Commerce declined Trina's request to rely on data from Xeneta AS ("Xeneta"), a market research firm in logistics, and continued to rely on Maersk data

to calculate freight expenses.  <u>See</u> Final Decision Memo at 27–32; <u>see also</u> [Trina's]

Surrogate Value Freight Submission at Exs. 1–3, CD 186, bar code 3594073-01 (July

17, 2017) ("Xeneta Freight Data").  Commerce also declined Trina's request to exclude

Thai import data with zero quantities when calculating its dumping margin.  <u>See</u>

Final Decision Memo at 20–22.   To derive Trina's surrogate financial ratios,

Commerce chose statements from Styromatic and KCE, <u>see</u> Final Decision Memo at

39–49, specifically relying on the unconsolidated version of KCE's statements.  <u>See</u>

Final Decision Memo at 48.  Finally, when valuing Trina's nitrogen FOPs, Commerce

continued to use Mexican import data.  <u>See</u> Final Decision Memo at 32–38.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28

U.S.C. § 1581(c) (2012), which grant the Court authority to review actions contesting

the final determination in an administrative review of an ADD order.  The court will

uphold Commerce's determination unless it is "unsupported by substantial evidence

on   the   record,   or   otherwise   not   in   accordance   with   law[.]"   19   U.S.C.

§ 1516a(b)(1)(B)(i).

## DISCUSSION

## I.      Adjusting Trina's Net U.S. Price

Trina challenges Commerce's refusal to increase its U.S. Price by the CVD

imposed on the subject merchandise in the companion CVD review.  <u>See</u> Trina's Br.

at 4–9. Defendant counters that Commerce is not required to increase the U.S. Price

because the CVD in the companion CVD review was not based on an affirmative finding that the Ex-Im Bank of China's Export Buyer's Credit Program ("Credit Program") was an export subsidy.  See Def.'s Resp. Mot. J. [Agency] R. at 8–10, Sept. 10, 2019, ECF No. 55 ("Def.'s Br.").  SolarWorld adds that intervening changes to the Credit Program have rendered inapposite Commerce's previous findings that the program is a countervailable export subsidy.  See Def.-Intervenor [SolarWorld's] Resp. Mots. J. Agency R. at 8–10, Sept. 18, 2019, ECF No. 59 ("Def.-Intervenor's Br.").  For the following reasons, Commerce's refusal to increase Trina's U.S. Price is contrary to law.

When reviewing an ADD order, Commerce determines antidumping duties owed on subject imports by calculating the amount by which the normal value of the merchandise exceeds its U.S. Price.  See 19 U.S.C. §§ 1673, 1675(a)(2)(A), (C); see also id. § 1677(35).  The normal value represents the price of the subject merchandise in the exporting country, see id. § 1677b, and the U.S. Price represents the price at which the subject merchandise is sold in the United States.  See id. § 1677a. However, where the subject merchandise is also covered by a CVD order, Commerce is required to increase the U.S. Price by the amount of any CVD imposed on the merchandise to offset an export subsidy.  Id. § 1677a(c)(1)(C).[7]

---

[7] When adjusting antidumping margins to account for countervailed export subsidies, Commerce relies on export subsidy rates found in the most recently completed

(footnote continued)

**PUBLIC VERSION**

To impose a CVD, Commerce must find that an exporter benefited from a countervailable subsidy. See 19 U.S.C. §§ 1671(a)(1), 1677(5)(B). A "countervailable subsidy" is a financial contribution, price support, or funding mechanism, provided by the government of a country, or any public entity within the territory of the country, that confers a benefit to its recipient. Id. § 1677(5)(B). The subsidy must also be "specific", meaning it is an (i) import substitution subsidy, (ii) export subsidy, or (iii) domestic subsidy that is specific, in law or fact, to an enterprise or industry within the jurisdiction of the authority providing it. Id. § 1677(5)(A); see also id. § 1677(5A)(A)–(D).[8] Thus, to impose a CVD, Commerce must find that an exporter

---

segment of the companion CVD proceeding. See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From [PRC], 80 Fed. Reg. 40,998 (Dep't Commerce July 14, 2015) (final results of [add] admin. review and final determination of no shipments; 2012-2013) ("Solar Cells from China") and accompanying Issues and Decisions Memo. for the [Solar Cells from China] at Cmt. 28, A-570-979, (July 7, 2015), available at https://enforcement.trade.gov/frn/summary/prc/2015-17238-1.pdf (last visited Apr. 30, 2020) (citations omitted).

[8] In general, a subsidy is countervailable if it "is specific as described in paragraph (5A)." 19 U.S.C. § 1677(5)(A). According to paragraph (5A), "[a] subsidy is specific if it is an export subsidy described in subparagraph (B) or an import substitution subsidy described in subparagraph (C), or if it is determined to be specific pursuant to subparagraph (D)." 19 U.S.C. § 1677(5A)(A). The statute provides the following definitions for such subsidies:

(B) Export subsidy

An export subsidy is a subsidy that is, in law or in fact, contingent upon export performance, alone or as 1 of 2 or more conditions.

(C) Import substitution subsidy

(footnote continued)

both benefited from a subsidy and that the subsidy was specific.  <u>See</u> 19 U.S.C.

§§ 1671(a)(1), 1677(5).  An export subsidy is per se specific, <u>see</u> <u>id.</u> § 1677(5A), and is

defined as "a subsidy that is, in law or in fact, contingent upon export performance,

alone or as 1 of 2 or more conditions."  <u>Id.</u> § 1677(5A)(B).

When determining specificity, or any statutory element for imposing a CVD,

Commerce necessarily determines facts before deciding whether to impose an adverse

inference.  Subject to 19 U.S.C. § 1677m(d), Commerce shall use facts otherwise

available to reach its final determination when "necessary information is not

available on the record"; as well as when a party "withholds information that has

been requested by [Commerce]," fails to provide the information timely or in the

manner requested, "significantly impedes a proceeding," or provides information

Commerce is unable to verify.  19 U.S.C. § 1677e(a).  Thereafter, under certain

circumstances, such as a party's failure to comply to the best of its ability with a

request for information, Commerce may "use an inference that is adverse to the

interests of that party in selecting from among the facts otherwise available."  19

---

An import substitution subsidy is a subsidy that is contingent upon the use of domestic goods over imported goods, alone or as 1 of 2 or more conditions.

(D) Domestic subsidy

In determining whether a subsidy (other than a subsidy described in subparagraph (B) or (C)) is a specific subsidy, in law or in fact, to an enterprise or industry within the jurisdiction of the authority providing the subsidy[.]

**PUBLIC VERSION**

U.S.C. § 1677e(b)(1)(A).  Commerce and parties generally refer to this two-step process by the shorthand "AFA" or "adverse facts available."  Employing AFA "does not obviate the need for Commerce to affirmatively find that the elements of the statute [it is applying] have been satisfied."  See Guizhou Tyre Co. v. United States, 43 CIT __, 415 F. Supp. 3d 1335, 1342 (2019) (quoting Changzhou Trina Solar Energy Co. v. United States, 43 CIT __, 359 F. Supp. 3d 1329, 1338 (2019) ("Changzhou")).  Accordingly, when Commerce imposes a CVD based on AFA, it still finds facts that establish the benefit conferred and specificity of the subsidy.  See 19 U.S.C. §§ 1671, 1677(5), (5A).

Here, Commerce declines to increase Trina's U.S. Price by the CVD it imposed on the subject merchandise when countervailing the Credit Program in the most recent review of the companion CVD order.  Final Decision Memo at 19–20.  Commerce explains that it does not increase Trina's U.S. Price because it did not determine that the Credit Program was an export subsidy in the companion CVD review.  Id.  Rather, Commerce contends that it employed AFA to countervail the Credit Program.  Id.  Commerce implies that, because it relied on AFA in the companion CVD review, it could have countervailed the Credit Program without determining whether the program was an export subsidy.  See id.

Commerce's refusal to increase Trina's U.S. Price is contrary to law because record evidence demonstrates that Commerce understood the Credit Program to be specific because it is an export subsidy, and it necessarily found the program to be

specific as an export subsidy in the companion CVD review.  See 19 U.S.C. §§ 1671, 1677(5), (5A); 3rd CVD AR IDM at Cmt. 1; see also Changzhou, 43 CIT at __, 359 F. Supp. 3d at 1338–39; 19 U.S.C. § 1677e.  To find the Credit Program "specific" based on AFA, the statute requires Commerce to draw the adverse inferences from facts available on the record.  See 19 U.S.C. § 1677e(a), (b).  In this case Commerce confronted whether the program was either an (i) import substitution subsidy, (ii) export subsidy, or, (iii) a domestic subsidy that is specific.  See 19 U.S.C. §§ 1677e(a), (b), 1677(5A); see also 19 U.S.C. 1516a(b)(1)(B)(i).  The only information about the Credit Program available to Commerce when employing AFA demonstrates that, between an import substitution subsidy, an export subsidy, and a domestic subsidy, Commerce necessarily found the program was specific because it is an export subsidy.[9]

For instance, to calculate the AFA rate in the companion CVD review, Commerce relied on a description of the Credit Program that could only indicate the program is an export subsidy.  Namely, Commerce used the Government of China's description that the Ex-Im Bank's "Credit Program provides loan support through export buyer's credits" to find the Credit Program comparable to another lending

---

[9] Commerce can derive an adverse inference from potential sources including information contained in the petition, a final determination in the investigation, any previous review under 19 U.S.C. § 1675 or determination under 19 U.S.C. § 1675b, or any other information placed on the record.  See 19 U.S.C. § 1677e(b)(2)(A)–(D).

program for purposes of selecting the AFA CVD rate.  3rd CVD AR IDM at Cmt. 2.

Between an import substitution subsidy, an export subsidy, and a domestic subsidy,

a program that provides loan support through export buyer's credits can only be

understood to be "a subsidy that is . . . contingent upon export performance."  19

U.S.C. § 1677(5A)(B) (defining export subsidy).

Similarly, in the CVD investigation underlying the companion CVD order, as

well as a separate CVD investigation into solar panels from the PRC, Commerce

described the Credit Program as an export subsidy.  In both investigations,

Commerce determined that the Ex-Im Bank of China uses the Credit Program "to

provide[ ] loans at preferential rates for the purchase of exported goods from the

PRC." Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into

Modules, From the [PRC], 77 Fed. Reg. 63,788 (Dep't Commerce Oct. 17, 2012) (final

affirmative [CVD] determination and final affirmative critical circumstances

determination) ("CVD Investigation Final") and accompanying Issues and Decisions

Memo. for [CVD Investigation Final] at 20, C-570-980, (Oct. 9, 2012), available at

https://enforcement.trade.gov/frn/summary/prc/2012-25564-1.pdf (last visited Apr.

30, 2020) ("CVD Investigation IDM"); [CVD] Investigation of Certain Crystalline

Silicon Photovoltaic Products From the [PRC], 79 Fed. Reg. 76,962 (Dep't Commerce

Dec. 23, 2014) (final affirmative [CVD] determination) ("Solar Panels from China

Investigation") and accompanying Issues & Decision Mem. for the Final

Determination in the [CVD] Investigation of Certain Crystalline Silicon Photovoltaic

Products from the [PRC] at 30, C-570-011, (Dec. 15, 2014) <u>available at</u>

https://enforcement.trade.gov/frn/summary/prc/2014-30071-1.pdf (last visited Apr.

30, 2020) ("Solar Panels from China Investigation IDM").[10]  Thus, for purposes of this

review, and lacking an apparent explanation from Commerce in the companion CVD

review as to the basis for its AFA determination that the Credit Program was

"specific",[11] the court must infer that Commerce found the Credit Program to be

"specific" in the companion CVD review because it found the program to be an export

subsidy.  19 U.S.C. § 1677(5A)(B) (defining export subsidy); <u>see also</u> 3rd CVD AR IDM

at Cmt. 2; CVD Investigation IDM at 20; Solar Panels from China Investigation IDM

at 30.  Consequentially, Commerce's refusal to increase the U.S. Price is contrary to

law.

Defendant argues that Commerce's refusal to increase Trina's U.S. Price is

consistent with agency precedent and Commerce's need to have confidence that any

adjustment made under 19 U.S.C. § 1677a(c)(1)(C) relates solely to export subsidies.

<u>See</u> Def.'s Br. at 9 (citing <u>Circular Welded Carbon-Quality Steel Pipe from Pakistan</u>,

---

[10] In <u>Solar Panels from China Investigation</u>, Commerce determined that it could not
verify reported "non-use" of the export buyer's credits and predicated its finding of
"use" based on AFA.  <u>See</u> Solar Panels from China Investigation IDM at 30.  However,
Commerce still determined that the Credit Program "provides loans at preferential
rates for the purchase of exported goods from the PRC."  Solar Panels from China
Investigation IDM at 30.

[11] Commerce's determination to countervail the Credit Program based on AFA was
challenged and remanded on grounds not directly relevant to this dispute.  <u>See</u>
<u>Changzhou Trina Solar Energy Co. v. United States</u>, 42 CIT __, 352 F. Supp. 3d 1316,
1325–27 (2018).

81 Fed. Reg. 36,867 (Dep't Commerce June 8, 2016) (affirmative prelim.

determination of sales at less than fair value and postponement of final

determination and ext. of provisional measures) ("CWP from Pakistan") and

accompanying Prelim. Decision Memo for [CWP from Pakistan] at 13, A-535-903,

(May                     31,                    2016),                 available                  at

https://enforcement.trade.gov/frn/summary/pakistan/2016-13481-1.pdf (last visited

Apr. 30, 2020) (unchanged in final determination) ("CWP from Pakistan IDM")); see

also Oral Arg. at 00:21:46–00:24:06, Mar. 11, 2020, ECF No. 82 ("Oral Arg."). The

statutory adjustment prevents a double remedy and unless the countervailed

program is an export subsidy, there may be no double remedy warranting an

adjustment.[12]  Commerce suggests that agency precedent, as exemplified by CWP

---

[12] Domestic subsidies presumably affect both normal value and U.S. Price and
therefore should not affect the dumping margin. See e.g., GPX Int'l Tire Corp. v.
United States, 666 F.3d 732, 735 n.2 (Fed. Cir. 2011) ("[The] adjustment [to U.S. Price
to account for countervailing duties based on export subsidies] is not made for
countervailing duties based on domestic subsidies presumably because these
subsidies are already reflected in the normal value.") ("GPX Int'l Tire Corp."),
superseded in part by statute as recognized in 678 F.3d 1308 (Fed. Cir. 2012); Low
Enriched Uranium From France, 69 Fed. Reg. 46,501, 46,506 (Dep't Commerce Aug.
3, 2004) (notice of final results of [ADD] admin. review) ("Low Enriched Uranium
From France"). Export subsidies benefit only exports, resulting in a lower U.S. Price
and a higher margin. This margin could be attributed to dumping or subsidization.
Where Commerce has already determined that the margin is attributed to
subsidization and imposes a CVD, Congress requires an adjustment to the U.S. Price
in a companion dumping proceeding to avoid the possibility of a double remedy that
exists with an export subsidy, and not a domestic subsidy. See 19 U.S.C. §
1677a(c)(1)(C); see also GPX Int'l Tire Corp., 666 F.3d at 735 n.2; Low Enriched
Uranium From France, 69 Fed. Reg. at 46,506.

from Pakistan, supports its position that where it imposes a CVD based on AFA it will not consider that CVD as one made to offset an export subsidy for purposes of the statutory adjustment.  See Final Decision Memo at 19–20.  However, putting to the side whether Commerce's practice in CWP from Pakistan is reasonable in that case, the case is inapposite here.  In the companion CVD investigation to that proceeding, Commerce received allegations that some of the programs it would go on to countervail based on AFA were export subsidies, CWP from Pakistan IDM at 13, but did not assess the veracity of those allegations because all of the mandatory respondents failed to cooperate.  See id.; see also Circular Welded Carbon-Quality Steel Pipe from Pakistan, 81 Fed. Reg. 20,619 (Dep't Commerce Apr 8, 2016) (prelim. affirmative [CVD] determination and alignment of final [CVD] determination with final [ADD] determination) ("CWP from Pakistan CVD") and accompanying Prelim. Decision Memo for [CWP from Pakistan CVD] at 11–14, C-535-904, (Apr. 1, 2016), available at  https://enforcement.trade.gov/frn/summary/pakistan/2016-08147-1.pdf (last visited Apr. 30, 2020) ("CWP from Pakistan CVD IDM").  In the companion CVD review to this proceeding, as explained, Commerce had access to various record-based findings that the Credit Program was an export subsidy.

Defendant-Intervenor SolarWorld argues that, by the time of the companion CVD review, there had been changes to the Credit Program that render Commerce's understanding of the program inapposite for purposes of applying an adjustment in this proceeding.  See Def.-Intervenor's Br. at 9–10.  Commerce does not reference

such changes in its explanation below.  Instead, Commerce explains its refusal to

increase the U.S. Price by noting that it based its decision to countervail the Credit

Program in the companion CVD review on AFA.  See Final Decision Memo at 19–20.

Further, even if the rationale that Defendant-Intervenor advances were reasonably

discernible from Commerce's explanation, it would fail nonetheless.  Although, in the

companion CVD review, Commerce did note changes to the Credit Program, see 3rd

CVD AR at Cmt. 1, Commerce's discussion of those changes indicate that a lack of

record information left the agency uncertain about whether the respondents in that

proceeding used, or benefitted from, the program.  See id.  There is no indication that

the changes undermine Commerce's understanding of whether the program is an

export subsidy.  See id.   Defendant and Defendant-Intervenor SolarWorld do not

point to any instance where Commerce has described the Credit Program as anything

other than an export subsidy.   To the extent that Defendant and Defendant-

Intervenor SolarWorld argue that an AFA determination does not represent an

affirmative determination, Commerce's reliance on AFA does not obviate the need to

render findings based on the record.  See Changzhou, 43 CIT at __, 359 F. Supp. 3d

at 1339.  For these reasons, Commerce's determination is contrary to law.

## II.    International Freight Expenses

Trina challenges Commerce's reliance on the Maersk data to calculate its

international freight expenses.  See Trina's Br. at 10–18.  Defendant counters that

Commerce reasonably relied on the Maersk data because, in addition to satisfying

the agency's selection criteria, the Maersk data is itemized, allowing Commerce to remove handling charges. See Def.'s Br. at 10–14. For the following reasons, Commerce's reliance on the Maersk data is not supported by substantial evidence.

In antidumping proceedings involving NMEs, Commerce generally determines normal value of the subject merchandise by valuing FOPs and adding an amount for profits and expenses. See 19 U.S.C. § 1677b(c)(1). Commerce values a respondent's FOPs and expenses using data from surrogate market economy countries that are: "(A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). To the extent possible, Commerce's regulatory preference is to "value all factors in a single surrogate country." 19 C.F.R. § 351.408(c)(2) (2017).[13]

When valuing a respondent's FOPs and expenses, Commerce must use the "best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce]." See 19 U.S.C. § 1677b(c)(1). Commerce has broad discretion to decide what constitutes "the best available information," as the phrase is not statutorily defined. See QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011) ("QVD Food Co."). However, the agency must ground its selection in the overall purpose of the statute, which is to calculate accurate dumping margins. See Rhone Poulenc, Inc. v. United States, 899

---

[13] Further citations to Title 19 of the Code of Federal Regulations are to the 2017 edition.

**PUBLIC VERSION**

F.2d 1185, 1191 (Fed. Cir. 1990) ("Rhone Poulenc, Inc."); see also Parkdale Int'l. v.

United States, 475 F.3d 1375, 1380 (Fed. Cir. 2007) ("Parkdale Int'l").

Commerce selects the best available information by evaluating data sources

based on their: (1) specificity to the input; (2) tax and import duty exclusivity; (3)

contemporaneity with the period of review; (4) representativeness of a broad market

average; and (5) public availability. See Import Admin., U.S. Dep't Commerce, Non-

Market Econ. Surrogate Country Selection Process, Policy Bulletin 04.1 (Mar. 1,

2004), available at https://enforcement.trade.gov/policy/bull04-1.html (last visited

Apr. 30, 2020); see also Prelim. Decision Memo at 21.

Commerce acknowledges that both the Maersk and Xeneta datasets equally

satisfy its selection criteria of tax exclusivity, contemporaneity, and public

availability.   Final Decision Memo at 29–32.   Commerce acknowledges that the

"Xeneta rates appear to [capture] a broader average rate than Maersk rates[.]"  Id. at

31. Nonetheless, Commerce chooses Maersk based upon the belief that only the

Maersk data allows the agency to remove U.S. handling charges and avoid double

counting those charges when calculating Trina's net U.S. Price.[14]  See id.

---

[14] Specifically, Commerce explains that:

> Trina reported U.S. brokerage and handling expense (i.e., the
> USBROKU variable) together with other U.S. movement expenses
> under the R_INLFWCU variable. Moreover, the record does not contain

(footnote continued)

Commerce must further explain or reconsider its choice of Maersk data because record evidence contradicts Commerce's observation that handling charges can only be removed from the Maersk data.  Record evidence indicates the Xeneta data's default settings can be—and indeed were—adjusted to exclude handling charges.  See Xeneta Freight Data at Exs. 1, 3.  Exhibit 3 to the Xeneta Freight Data depicts the filter "OTHC and DTHC excluded" as selected when the rates were submitted.  See Xeneta Freight Data at Ex. 3.  Exhibit 1 to the Xeneta Freight data indicates that "THC" stands for "terminal handling charges."  See id. at Ex. 1.  Record evidence contradicts Commerce's rationale for relying on the Maersk data, therefore, the court must remand the determination to Commerce for further explanation or reconsideration.[15]

---

the information to segregate U.S. brokerage and handling expense (i.e., the USBROKU variable) from the other U.S. movement expenses reported in the R_INLFWCU variable. Because the Xeneta data includes U.S. handling expense and cannot be adjusted to remove this charge, and the U.S. brokerage and handling expense (i.e., the USBROKU variable) cannot be segregated from the other U.S. movement expenses reported in the R_INLFWCU variable, using the Xeneta rate would double count Trina's handling charge when calculating net U.S. price.

Final Decision Memo at 31 (footnotes and citations omitted).

[15] During oral argument, Defendant-Intervenor SolarWorld acknowledged that the Xeneta data filter could be adjusted, but argued that there is no evidence Trina actually provided the data to Commerce free of handling charges.  See Oral Arg. At 00:37:00–00:38:16.  The record evidence contradicts that argument, see Xeneta

(footnote continued)

Additionally, regarding specificity, Commerce reasons that "the Maersk rates are for shipping electronic goods while the Xeneta data do not specify the products." Final Decision Memo at 31.  Commerce explains that the Maersk rates "are for shipping electronic goods, which would include solar panels, while the Xeneta rates are not for shipping a particular type of product." Id. at 30.  However, Commerce does not cite record evidence to support the assumption that shipping solar panels requires special handling or containers, or incurs special charges, such that the Maersk rates for electronics would be more specific than rates derived from the Xeneta data.  Indeed, the record indicates that both datasets provide information for 40 foot, high-cube, dry containers—the container used by Trina—and that solar panels are loaded and moved on pallets.  See Trina's Br. at 12; see also Trina's Verification at Ex. 18, CDs 428, 433, bar codes 3641644-01, 3641644-06 (Nov. 15, 2017).  On remand, if Commerce continues to rely on Maersk data, it should further explain or reconsider its determination that the Maersk data is more specific and its resulting choice of the Maersk data.

---

Freight Data at Ex. 3, and furthermore, Commerce did not rely on this rationale below.  See Final Decision Memo at 30–31.  This court cannot now consider SolarWorld's ex post facto rationalization of Commerce's determination.  See Sec. & Exch. Comm'n v. Chenery Corp., 332 U.S. 194, 196 (1947).

**PUBLIC VERSION**

## III.  Inclusion of Zero Quantity Import Data

Trina contests Commerce's refusal to exclude Thai import data with zero quantities when calculating surrogate values. <u>See</u> Trina's Br. at 18–21. Defendant maintains that Commerce's use of zero quantity import data is reasonable because record evidence indicates that using the data does not result in error. <u>See</u> Def.'s Br. at 14–17. Commerce's decision to include zero quantity import data is reasonable.

Commerce maintains that Trina's concerns about occurrences of zero quantity values in the Thai import data are unfounded. <u>See</u> Final Decision Memo at 21–22. Commerce explains that occurrences of zero quantities in the Thai import data result from the fact that the Global Trade Atlas ("GTA"), the source of the import data, reports data as whole numbers. <u>Id.</u> Commerce thus reasons that instances of zero quantities do not indicate that the data is unreliable because the zeros are the result of rounding. <u>See id.</u> Further, Commerce observes that including the zero quantities would not distort its calculations because "[r]ounding has both upward and downward effects[,]" resulting in an offsetting effect. <u>Id.</u> at 21. Trina counters that Commerce's offsetting rationale applies for all numbers that might be included in the data except zero. <u>See</u> Trina's Br. at 19–20. Trina submits that, unlike every other whole number, there will never be an instance of rounding a quantity up to zero, as only a negative quantity can be rounded up to zero. <u>See</u> <u>id.</u>

Even if correct, Trina's argument does not detract from Commerce's determination that the zero quantities in the Thai import data are the result of

rounding and the inclusion of those quantities does not render the data distorted.  See

Final Decision Memo at 21–22.  It is logical for Commerce to assume that a dataset

that reports quantities as whole numbers does so as a result of rounding, and that

the zero quantities are the result of quantities rounded down to zero.  See id.

Commerce adequately addresses arguments that would undermine this logical

assumption.  For example, Commerce explains that if zero quantities were the result

of error, it would expect the same error to occur with respect to reported values—a

phenomenon that does not occur within the data.  Final Decision Memo at 21.  As

Commerce explains, Trina's argument fails to affirmatively demonstrate that the zero

quantity values are the result of error, or that the inclusion of zero quantity values

significantly distorts the data.  See id.  Although Trina's suggestion to remove the

zero quantities from the data might be a reasonable alternative, it does not

demonstrate that Commerce's approach was unreasonable.  See Trina's Br. at 18–20.

Indeed, as Commerce notes, none of the parties challenge the reliability of the GTA

import data as a whole.  See Final Decision Memo at 21.  Thus, Commerce's

determination to include zero quantity import data is reasonable.[16]

---

[16] Trina contends that it is arithmetically incorrect to divide a number by zero.  See
Trina's Br. at 20.  However, it is not clear that Commerce made such an attempt, and
therefore it is unclear how Trina's contention undermines Commerce's
determination.

PUBLIC VERSION

## IV.  Surrogate Financial Ratios

SolarWorld challenges Commerce's reliance on KCE's unconsolidated statements to derive surrogate financial ratios when calculating Trina's overhead, SG&A expenses, and profit.  See SolarWorld's Br. at 7–12.  SolarWorld argues that KCE's consolidated statements are a better representation of Trina's structure and experience because both KCE and Trina are multi-layer corporations with numerous subsidiaries.  See id.  Defendant responds that Commerce's choice is reasonable because, unlike KCE's unconsolidated statements, KCE's consolidated statements both reflect operations outside the surrogate country and capture the experience of producers of noncomparable merchandise.  See Def.'s Br. at 17–19.  For the following reasons, Commerce's determination is supported by substantial evidence.

In an ADD review involving an NME country, to value SG&A expenses, factory overhead, and profit, Commerce uses "financial ratios derived from financial statements of producers of comparable merchandise in the surrogate country." Ad Hoc Shrimp Trade Action Comm. v. United States, 618 F.3d 1316, 1319–20 (Fed. Cir. 2010) (citing Dorbest Ltd. v. United States, 604 F.3d 1363, 1368 (Fed. Cir. 2010)). Commerce prefers to use non-proprietary information gathered from producers of identical or comparable merchandise in the surrogate country.  19 C.F.R. § 351.408(c)(1), (4).

When calculating Trina's margin, Commerce used KCE's unconsolidated statements to derive surrogate financial ratios.  See Final Decision Memo at 48–49.

Commerce explains there is no evidence that KCE's unconsolidated statements "reflect operations outside of Thailand." Id. at 48. Commerce also observes that there is no evidence that "KCE's unconsolidated statements reflect production of non-comparable merchandise[.]" Id. (footnotes and citations omitted). By contrast, Commerce notes that KCE's consolidated statements "include several subsidiaries that are located outside of Thailand (i.e., Taiwan, Singapore, and United States), and subsidiaries that do not produce comparable merchandise (i.e., laminates and chemical solutions)." Id. (footnotes and citations omitted). Given Commerce's regulatory preference for information gathered from producers of identical or comparable merchandise in the surrogate country, see 19 C.F.R. § 351.408(c)(4), Commerce's determination is reasonable.

SolarWorld alleges that, contrary to Commerce and Defendant's representations, KCE's consolidated statements do not include statements from subsidiaries in Taiwan and the United States. See [SolarWorld's] Reply Br. Supp. Rule 56.2 Mot. J. Agency R. at 4–5, Oct. 30, 2019, ECF No. 70 ("SolarWorld's Reply Br.") (citing to Letter to Commerce Pertaining to Surrogate Values Submission at Ex. 10, CD 170–85, PD 175–87, bar codes 3591341-01–16, 3591420-01–13 (July 10, 2017) ("KCE Financial Statements"); see also Def.'s Br. at 18–19; Final Decision Memo at 48. SolarWorld avers that KCE's Taiwanese and United States entities are listed as associates, not subsidiaries, and that their activities would not be reflected in KCE's consolidated statements. See SolarWorld's Reply Br. at 4–5; see also KCE Financial

Statements.   The remaining Singaporean entity, SolarWorld explains, is a single

subsidiary that represents a very small fraction of KCE's revenues.  See SolarWorld's

Reply Br. at 5.

Notwithstanding SolarWorld's claim, it is reasonably discernible that

Commerce found that KCE's Taiwanese and United States entities reported business

activities that are reflected in KCE's consolidated statements.  See Final Decision

Memo at 48.  Moreover, SolarWorld fails to persuade that Commerce's determination

is unreasonable because the consolidated statements still include information from

producers of non-comparable merchandise.  See Final Decision Memo 48–49.

SolarWorld argues that Commerce's justifications for using KCE's

unconsolidated statements contradict agency precedent.  See SolarWorld's Reply Br.

at 3–4 (citing Fujian Lianfu Forestry Co. v. United States, 33 CIT 1056, 1082–83, 638

F. Supp. 2d 1325, 1353 (2009) ("Fujian"); Qingdao Sea-Line Trading Co. v. United

States, 36 CIT 451, 467 (2012) ("Qingdao")).  SolarWorld cites Commerce's tendency

to find that "that the greatest number of financial statements yields the most

representative data from the relevant manufacturing sector, and thus provides the

most accurate portrayal of the economic spectrum."  Id. (quoting Fujian, 33 CIT at

1082–83, 638 F. Supp. 2d at 1353).  SolarWorld's appeal to agency precedent is

unavailing because, as explained, Commerce found that KCE's consolidated

statements contain information from producers of non-comparable merchandise.  See

Final Decision Memo at 48.  As Defendant points out, more data is only better if that

data has probative value.  See Oral Arg. at 00:58:34–00:59:25, Mar. 11, 2020, ECF No. 82 ("Oral Arg.").  Moreover, as Defendant also points out, SolarWorld's argument obscures the fact that Commerce did not rely solely on KCE's unconsolidated statements, but Styromatic's statements as well.  See Final Decision Memo at 43–44, 48–49; see also Oral Arg. at 00:58:34–00:59:25.  SolarWorld fails to demonstrate that Commerce's reliance on the unconsolidated statements is unreasonable.[17]  See Consolo. v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966) ("the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence"); see also Daewoo Elecs. Co. v. Int'l Union of Elec., Elec., Tech., Salaried & Mach. Workers, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (explaining that the inquiry is whether the record reasonably supports an agency's decision, not whether some other reasonable inference exists).

---

[17] SolarWorld also notes that Commerce's analysis fails to account for the fact that Trina also has subsidiaries outside of China.  SolarWorld's Br. at 11.  Commerce explains that it has a preference for not using consolidated statements when those statements reflect operations outside of the surrogate country or production of non-comparable merchandise.  See Final Decision Memo at 48.  From this statement it is reasonably discernible that Commerce determined that KCE's unconsolidated statements would yield more reliable and accurate surrogate financial ratios than would relying on statements that include information from entities outside of Thailand, regardless of whether Trina had subsidiaries outside of China.  See Final Decision Memo 48–49.  SolarWorld's argument fails to demonstrate how Commerce's preference is unreasonable.

## V.     Valuing Trina's Nitrogen Input Using Mexican Import Statistics

SolarWorld challenges Commerce's decision to value Trina's nitrogen input using Mexican import data. See SolarWorld's Br. at 12–18. SolarWorld argues that Commerce's determination that the Thai import data for nitrogen is unreliable is unsupported, and that Commerce's departure from the primary surrogate country is contrary to agency practice. See id. Defendant contends that Commerce reasonably determines that the two sources of Thai import data for nitrogen are unreliable because they contradict each other, and Commerce's reliance on Mexican import data under such circumstances is consistent with established agency precedent. See Def.'s Br. at 19–21. For the following reasons, Commerce's determination to value Trina's nitrogen FOPs is reasonable.

As explained, in antidumping proceedings involving NMEs, Commerce determines normal value based on the FOPs used to produce the subject merchandise, with an amount added for profits and expenses. See 19 U.S.C. § 1677b(c)(1). When valuing a respondent's FOPs, Commerce has discretion to choose what constitutes the best available information on the record for purposes of satisfying its statutory mandate to calculate accurate dumping margins. See QVD Food Co., 658 F.3d at 1323; Rhone Poulench, Inc., 899 F.2d at 1191; Parkdale Int'l., 475 F.3d at 1380. Commerce normally relies on the primary surrogate country to calculate all surrogate values. 19 C.F.R. § 351.408(c)(2). Nonetheless, Commerce will resort to a secondary surrogate country when data from the primary surrogate country is unreliable. See

e.g., Sodium Hexametaphosphate From the People's Republic of China: Final Results

of Antidumping Duty Administrative Review, 77 Fed. Reg. 59375 (Dep't Commerce

Sept. 27, 2012) (final results of [ADD] admin. review) and accompanying Issues and

Decision Memorandum for the Final Results of the Second Administrative Review of

Sodium Hexametaphosphate from the [PRC], A-570-908, at 4 & n.15 (Sept. 19, 2012),

available at http://enforcement.trade.gov/frn/summary/prc/2012-23832-1.pdf (last

visited Apr. 30, 2020); see also Antidumping Duties; Countervailing Duties, 62 Fed.

Reg. 27,296, 27,366–67 (Dep't Commerce May 19, 1997).

Commerce relies on Mexican import data, rather than Thai import data, to

value Trina's nitrogen FOPs. See Final Decision Memo at 34–35. Commerce explains

that it did not use the Thai import data "because the two Thai sources [it] considered

for valuing nitrogen present significantly dissimilar prices," thus "rais[ing] questions

as to which Thai data [source] on the record, namely the [GTA] Thai import data or

the GasWorld Thailand data, reflect the actual broad market average price of

nitrogen in Thailand." See Final Decision Memo at 35.[18]  Commerce reasonably

questions the reliability of the Thai import data because such divergent sources

logically suggest that at least one source cannot be correct.  Commerce's concern is

not that the data is unreliable because it is aberrational as SolarWorld suggests.  See

---

[18] Commerce contrasts the GTA Thai average unit value for nitrogen, which is "$27.10
per kilogram," with the GasWorld Thai domestic prices for nitrogen, which are "$0.14
per kilogram (i.e., liquid nitrogen) and $0.05 per kilogram (i.e., nitrogen gas)."  Final
Decision Memo at 35.

SolarWorld's Br. at 12–18.  Rather, Commerce found that the two sources of Thai import data undermine each other.  Id.

SolarWorld maintains that Commerce failed to demonstrate that the GasWorld Thai import data is a reliable benchmark against which to measure the GTA Thai import data.  See SolarWorld's Reply Br. at 10.  Commerce explains that it did not use the GasWorld data as a benchmark to determine that the GTA data was aberrant.  See Final Decision Memo at 35.  Rather, it found that the two sources of Thai data contradict each other, and are therefore, unreliable.  See id.  Similarly, SolarWorld's contentions regarding Commerce's deviation from agency precedent miss the mark, see SolarWorld's Br. at 12–16, because they speak to Commerce's methodology for determining whether data is aberrational, not whether it is reliable.  Commerce's decision is supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Commerce's final determination is remanded for further explanation or reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the remand redetermination; and it is further

**PUBLIC VERSION**

**ORDERED** that the parties shall have 30 days thereafter to file their replies

to comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 14 days thereafter to file the Joint

Appendix; and it is further

**ORDERED** that Commerce shall file the administrative record within 14 days

of the date of filing of its remand redetermination.


  /s/ Claire R. Kelly
Claire R. Kelly, Judge


Dated:        May 13, 2020
              New York, New York