Slip Op. 21-2

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CHANGZHOU TRINA SOLAR ENERGY CO., LTD. ET AL., <br><br>  Plaintiffs and Consolidated Plaintiffs, <br><br> and <br><br> JA SOLAR TECHNOLOGY YANGZHOU CO., LTD. ET AL., <br><br> Plaintiff-Intervenors, <br><br> v. <br><br> UNITED STATES, <br><br>  Defendant, <br><br> and <br><br> SOLARWORLD AMERICAS, INC. ET AL., <br><br> Defendant-Intervenor and Consolidated Defendant-Intervenor. | Before: Claire R. Kelly, Judge <br><br> Consol. Court No. 18-00176 |

# OPINION AND ORDER

[Sustaining in part and remanding in part the results of Commerce's remand redetermination in the fourth administrative review of the antidumping duty order covering crystalline silicon photovoltaic cells, whether or not assembled into modules.]

Dated: January 4, 2021

Consol. Court No. 18-00176                                                                 Page 2

Robert G. Gosselink and Jonathan M. Freed, Trade Pacific, PLLC, of Washington, DC, for plaintiff.

Jeffrey S. Grimson, Sarah M. Wyss, and Bryan P. Cenko, Mowry & Grimson, PLLC, of Washington, DC, for consolidated plaintiffs and plaintiff-intervenors JA Solar Technology Yangzhou Co., Ltd., Shanghai JA Solar Technology Co., Ltd. and JingAo Solar Co., Ltd.

Timothy C. Brightbill, Laura El-Sabaawi, and Usha Neelakantan, Wiley Rein, LLP, of Washington, DC, for consolidated plaintiff and defendant-intervenor SolarWorld Americas, Inc.

Tara K. Hogan, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. Also on the brief was Jeffrey Bossert Clark, Acting Assistant Attorney General, and Jeanne E. Davidson, Director. Of Counsel on the brief was Ian McInerney, Office of Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Kelly, Judge: Before the court for review is the U.S. Department of Commerce's ("Commerce") remand redetermination filed pursuant to the court's order in Changzhou Trina Solar Energy Co. v. United States, 44 CIT __, __, 450 F. Supp. 3d 1301, 1317–18 (2020) ("Changzhou I"). See Final Results of Remand Redetermination, Aug. 7, 2020, ECF No. 91-1 ("Remand Results"). In Changzhou I, the court remanded Commerce's decision to value international freight expenses using Maersk Line ("Maersk") rate quotes. See Changzhou I, 44 CIT at __, 450 F. Supp. 3d at 1312–13. Moreover, the court remanded Commerce's refusal to increase Changzhou Trina Solar Energy Co., Ltd. et al.'s[1] ("Trina") export price (or constructed

---

[1] Changzhou Trina Solar Energy Co., Ltd., Trina Solar (Changzhou) Science & Technology Co., Ltd., Yancheng Trina Solar Energy Technology Co., Ltd., Changzhou Trina Solar Yabang Energy Co., Ltd., Turpan Trina Solar Energy Co., Ltd., Hubei Trina Solar Energy Co., Ltd., and Trina Solar (Hefei) Science & Technology Co., Ltd are referred to, collectively, as "Trina."

export price) ("U.S. Price") by the amount of the countervailing duty ("CVD") imposed to offset the benefit conferred to manufacturers and exporters of the subject merchandise by the Export Import Bank of China's ("Ex-Im Bank") Export Buyer's Credit Program ("Credit Program") in the concurrent administrative review of the companion CVD Order ("companion CVD review"). See id. at 1307–12.

On remand, Commerce continues to rely on Maersk data to value Trina's international freight expenses. See Remand Results at 4–17. Under respectful protest,[2] Commerce applies the statutory adjustment to Trina's U.S. Price. See Remand Results at 17–19. For the following reasons, Commerce's redetermination is remanded in part and sustained in part.

## BACKGROUND

The court presumes familiarity with the facts of this case, as set out in the previous opinion ordering remand to Commerce, and now recounts the facts relevant to the court's review of the Remand Results. See Changzhou I, 44 CIT at __, 450 F. Supp. 3d at 1304–07. On July 27, 2018, Commerce published its final determination in the fourth administrative review of the antidumping duty ("ADD") order covering crystalline silicon photovoltaic cells, whether or not assembled into modules ("solar cells" or "solar panels"), from the People's Republic of China ("PRC" or "China"). See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From

---

[2] By adopting a position forced upon it by the Court "under protest," Commerce preserves its right to appeal. See Viraj Grp., Ltd. v. United States, 343 F.3d 1371, 1376 (Fed. Cir. 2003).

the [PRC], 83 Fed. Reg. 35,616 (Dep't Commerce July 27, 2018) (final results of [ADD] admin. review and final determination of no shipments; 2015–2016) ("Final Results") and accompanying Issues and Decisions Memo. for the [Final Results], A-570-979, (July 11, 2018), ECF No. 36-5 ("Final Decision Memo").

    Given that Commerce considers the PRC to be a nonmarket economy ("NME"), when calculating Trina's dumping margin, Commerce determined the normal value of Trina's entries of subject merchandise by using data from a surrogate market economy country ("surrogate country") at a comparable level of economic development to value the factors utilized to produce the subject merchandise ("factors of production" or "FOPs"). See Section 773(c)(4) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677b(c)(4) (2018).[3] Commerce chose Thailand as the primary surrogate country. See SolarWorld Case Br. at 15, Feb. 28, 2018, PD 394, bar code 3678213-01.[4] Commerce compared the normal value of the subject merchandise to Trina's U.S. Price, and its final determination yielded a weighted average dumping margin of 15.85 percent for Trina. See Final Results, 83 Fed. Reg. at 35,618.

---

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

[4] On November 9, 2018, Defendant submitted indices to the confidential and public records underlying Commerce's Final Results. These indices are located on the docket at ECF Nos. 36-2 & -3 and 36-4, respectively. All further references in this opinion to administrative record documents are identified by the numbers assigned by Commerce in those indices and preceded by "PD" and "CD" to denote public or confidential documents.

Consol. Court No. 18-00176 Page 5

Trina, as well as JA Solar Technology Yangzhou Co., Ltd., Shanghai JA Solar Technology Co., Ltd. and JingAo Solar Co., Ltd. (collectively, "JA Solar"), and SolarWorld Americas, Inc. ("SolarWorld") appealed to this court and challenged various aspects of Commerce's final determination. See Pl. [Trina's] 56.2 Mot. J. Agency R., Feb. 15, 2019, ECF No. 41-1 ("Trina's Moving Br."); Consol. Pls.' & Pl.-Intervenors' 56.2 Mot. J. Agency R., Feb. 15, 2019, ECF No. 43-1 ("JA Solar's Moving Br."); Def.-Intervenor and Consol. Def.-Intervenors' [SolarWorld's] 56.2 Mot. J. Agency. R., Feb. 15, 2019, ECF No. 44-2 ("SolarWorld's Moving Br."). Trina and JA Solar challenged Commerce's refusal to increase Trina's U.S. Price to account for the 5.46 percent ad valorem CVD rate it imposed, based on facts available with an adverse inference ("adverse facts available" or "AFA"),[5] on the subject merchandise in the companion CVD review. See Trina's Moving Br. at 4–9; JA Solar's Moving Br. at 5–6; Final Decision Memo at 17–20; Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the [PRC], 82 Fed. Reg. 32,678 (Dep't Commerce July 17, 2017) (final results of [CVD] admin. review, and partial rescission of [CVD] admin. review; 2014) ("3rd CVD AR") and accompanying Issues and Decisions Memo. for [3rd CVD AR] at Cmts. 1–2, C-570-980, (July 10, 2017), available

---

[5] Parties and Commerce sometimes use the shorthand "AFA" or "adverse facts available" to refer to Commerce's reliance on facts otherwise available with an adverse inference to reach a final determination. AFA, however, encompasses a two-part inquiry established by statute. See 19 U.S.C. § 1677e(a)–(b). It first requires Commerce to identify information missing from the record, and second, to explain how a party failed to cooperate to the best of its ability as to warrant the use of an adverse inference when "selecting among the facts otherwise available." Id.

at https://enforcement.trade.gov/frn/summary/prc/2017-14957-1.pdf (last visited Dec. 28, 2020) ("3rd CVD AR IDM").

With respect to its calculation of normal value, Trina and JA Solar challenged Commerce's decision to use Maersk data to value Trina's international freight expenses and refusal to exclude Thai import data with zero quantities when calculating surrogate values. See Trina's Moving Br. at 10–21; JA Solar's Moving Br. at 5–6. SolarWorld challenged Commerce's selection of unconsolidated financial statements from KCE Electronics Public Company Limited ("KCE") to derive surrogate financial ratios and Commerce's decision to value Trina's nitrogen input using Mexican import data. See SolarWorld's Moving Br. at 7–18.

On May 13, 2020, the court issued Changzhou I, where it sustained in part Commerce's final determination. See Changzhou I, 44 CIT at __, 450 F. Supp. 3d at 1301–18. Namely, the court sustained: Commerce's inclusion of zero quantity Thai import data when calculating surrogate values; Commerce's selection of KCE's statements to derive surrogate financial ratios; and Commerce's decision to use Mexican import data to value Trina's nitrogen inputs when determining the normal value of Trina's entries of subject merchandise. See id. at 1313–17.

However the court remanded for further explanation or reconsideration, Commerce's refusal to increase Trina's U.S. Price to account for the AFA CVD rate imposed to offset the benefit conferred to producers and manufacturers of the subject merchandise by the Credit Program in 3rd CVD AR. See Changzhou I, 44 CIT at __,

450 F. Supp. 3d at 1307–13, 1317. The court held that Commerce did not support its finding that the Credit Program was never determined to be an export subsidy in 3rd CVD AR solely on the fact that its decision to countervail the Credit Program there was based on AFA, because AFA still requires a record-based determination. See id. at 1308–09. Moreover, the court noted that descriptions of the Credit Program in 3rd CVD AR demonstrated that Commerce found the program to be export contingent. See id. at 1310. With respect to Commerce's selection of Maersk data to value Trina's international freight expenses, the court noted that Commerce's justifications for relying on the Maersk data were based on the mistaken observation that data from Xeneta AS ("Xeneta")—a source for freight rates Commerce weighed the Maersk data against—included handling charges. See id. at 1312–13.

On August 7, 2020, Commerce issued its remand redetermination. See generally Remand Results. Although Commerce conceded the Xeneta data was submitted without handling charges, Commerce continued to rely on the Maersk data to value international freight rates. See Remand Results at 4–17. Under respectful protest, Commerce applied the statutory adjustment to Trina's U.S. Price to account for the AFA CVD rate imposed in the companion CVD review. See Remand Results at 17–19.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2018), which grant the Court authority to review actions contesting

the final determination in an administrative review of an ADD order. The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I. International Freight Expenses

Although Commerce now concedes that both data sets properly exclude brokerage and handling expenses,[6] Commerce maintains that the Maersk data is more specific to Trina's experience than the Xeneta data because it reflects the type of product and shipping container that Trina used. See Remand Results at 4–8. Trina contends that the record continues to contradict Commerce's conclusion. See Remand Results at 8–11. Commerce's determination is remanded for further consideration.

When valuing a respondent's FOPs and expenses, Commerce must use the "best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce]." 19 U.S.C.

---

[6] As a threshold matter, Commerce previously determined the Maersk data was better than the Xeneta data because Maersk data was adjustable to exclude brokerage and handling charges. See Final Decision Memo at 30. Commerce found that the Xeneta data was not adjustable and would lead to double counting for these charges. See id. The court held that Commerce's conclusion was not supported by the record, which showed that both sets of data excluded brokerage and handling charges. See Changzhou I, 44 CIT at __, 450 F. Supp. 3d at 1312–13. On remand, Commerce agrees that it was incorrect to state that the Xeneta data failed to account for brokerage and handling charges. See Remand Results at 5. Nonetheless, on other grounds, Commerce continues to find that the Maersk data is superior to the Xeneta data. See id.

Consol. Court No. 18-00176 Page 9

§ 1677b(c)(1).  Commerce has broad discretion to decide what constitutes "the best available information," as the phrase is not statutorily defined.  See QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011) ("QVD Food Co.").  However, the agency must ground its selection in the overall purpose of the statute, which is to calculate accurate dumping margins.  See Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990); see also Parkdale Int'l. v. United States, 475 F.3d 1375, 1380 (Fed. Cir. 2007).

Commerce selects the best available information by evaluating data sources based on their: (1) specificity to the input; (2) tax and import duty exclusivity; (3) contemporaneity with the period of review; (4) representativeness of a broad market average; and (5) public availability.  See Import Admin., U.S. Dep't Commerce, Non-Market Econ. Surrogate Country Selection Process, Policy Bulletin 04.1 (Mar. 1, 2004), available at https://enforcement.trade.gov/policy/bull04-1.html (last visited Dec. 28, 2020); see also Final Decision Memo at 35.

Commerce's determination that the Maersk data is more specific than the Xeneta data, and thus more accurate, see Remand Results at 4–8, 11–17, is unsupported by substantial evidence.  Commerce conflates two distinct rationales, each unsupported, in an attempt to justify its determination.  First, Commerce concludes that the Maersk data is more specific because the rate is for the shipment

of electronic goods. See Remand Results at 5.[7]  Commerce reasons that electronics and solar panels are the same for purposes of shipping, and therefore Maersk data are "more specific to Trina's experience than the Xeneta rates[,]" which were "not specific to any product." See Remand Results at 4–5.  Yet, Commerce does not address the court's concern that it does not cite any evidence that shipping electronics or shipping solar panels is more or less expensive than shipping anything else. See Changzhou I, 44 CIT at __, 450 F. Supp. 3d at 1313 ("Commerce does not cite record evidence to support the assumption that shipping solar panels requires special handling or containers, or incurs special charges, such that the Maersk rates for electronics would be more specific than rates derived from the Xeneta data."). Nothing in the record supports Commerce's implicit assumption that, for non-hazardous or nonrefrigerated goods, the type of goods matters for specificity purposes. Commerce assumes varying costs for shipping different types of goods (i.e., electronics vs. non-electronics), by conflating its discussion of the costs of shipping particular types of goods with the costs of shipping in different types of containers.  See Remand Results at 12–13 (noting that the product being shipped can affect the container used and that different containers have different costs, but subsequently acknowledging that the different containers are for hazardous and refrigerated goods).  Different types of containers may have varying costs, but nothing in the record suggests that

---

[7] Commerce states that the Harmonized Tariff Schedule supports its position that solar panels are comparable to "electronic goods." See Remand Results at 5–6.

solar panels or electronics are shipped in a container distinct from any other non-hazardous and nonrefrigerated goods.

Commerce's second basis to prefer the Maersk data focuses on the varying costs for different types of containers. Commerce notes that Maersk requires parties to identify whether goods are hazardous or require refrigeration. See Remand Results at 6. Commerce reasons that the Maersk data must therefore reflect rates exclusive of refrigerated or hazardous shipments. See id. Yet, Commerce's rationale for concluding that the Maersk data is exclusive of refrigerated and hazardous shipments conflicts with its rationale for concluding the opposite regarding the Xeneta data. Commerce states:

> when requesting rate quotations Maersk requests that customers identify whether a requested shipment contains hazardous goods or requires refrigeration and there is no indication that the petitioner identified such requirements in the Maersk rate quotations it submitted. By contrast, there is no evidence that the Xeneta data submitted by Trina distinguishes between regular shipments, hazardous shipments, and shipments that require refrigeration.

Remand Results at 6. Thus, Commerce states that there is no indication that the petitioners requested quotes for refrigerated or hazardous shipment and assumes that the lack of information supports the conclusion that the Maersk data did not include quotes for refrigerated or hazardous materials. See id. It then points to the lack of information concerning whether the Xeneta quotes were for refrigerated or hazardous materials and concludes that the Xeneta data includes quotes for refrigerated or hazardous materials. See id. Although it may be reasonable to infer that Maersk data can be sorted by shipping container while Xeneta data cannot, it is

not reasonable to assume, without more, that the Maersk data supplied on this record was exclusive of special charges for refrigerated or hazardous shipping containers.[8]

For the first time in the remand redetermination, Commerce highlights that the Maersk data states that it is for a 40-foot high cube dry container, while the Xeneta data is for "shipping unknown goods that could be dissimilar to solar panels and that could require special equipment or handling, unlike solar panels." See Remand Results at 6–7. It is unclear to the court if Commerce is arguing that the absence of the word "dry" in the Xeneta data indicates either that there are distinct types of 40-foot high cube containers, or that the Xeneta containers may either be for refrigerated goods or for hazardous goods because they do not indicate "dry." If the former, neither the Maersk data nor the Xeneta data on the record indicates that 40-foot containers are anything but dry. In fact, the Xeneta data indicates that there are three type of containers: 20-foot, 40-foot and 40-foot high cube.[9] See Crystalline

---

[8] As discussed further below, it seems reasonable that shipping containers for refrigerated or hazardous goods would be more, not less, expensive. Yet, Commerce assumes that the Xeneta data includes costs for shipping refrigerated or hazardous goods even though Xeneta rates are less expensive than Maersk rates. See Remand Results at 6; compare Trina's Surrogate Value Freight Submission at Ex. 2 (summarizing the Xeneta freight rates), with Petitioner's Submission of Surrogate Values and New Factual Information at Ex. 1, CD 417-426, bar code 3636213-01 (Nov. 2, 2017) (summarizing the Maersk freight rates) ("SolarWorld's Surrogate Value Freight Submission").

[9] In contesting the final results Trina represented that the Xeneta data reflects 40-foot high cube dry containers. See Trina's Moving Br. at 12. Neither the Defendant

(footnote continued)

Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the [PRC]: Response to Request for International Freight Surrogate Values [for the 2015-2016 Admin. Review] at Ex. 1, 4, CD 186, bar code 3594073-01 (July 17, 2017) ("Trina's Surrogate Value Freight Submission"). If the latter, as explained above, neither the Maersk data nor the Xeneta data makes clear whether the rates supplied are inclusive of refrigerated or hazardous goods.[10]

Given that Commerce cannot conclude that either data set excludes quotes for hazardous or refrigerated goods, and that the record lacks support for distinct costs for shipping electronics, Commerce's determination is unreasonable in light of the evidence that detracts from its determination. Commerce uses its unsupported conclusion regarding container specificity to elide an analysis of route specificity as well as representativeness, factors which detract from its determination. See Remand Results at 8, 16 ("[T]here is no benefit to including more data in an average if the data are not specific to Trina's experience.")

On remand Commerce must address evidence which detracts from its determination. First, Commerce does not confront the lack of route specificity in the

---

nor the Defendant-Intervenor contested that representation. Trina continues to represent in its submissions challenging the remand redetermination that the Xeneta data reflects 40-foot high cube dry containers. See, e.g., Pl. Trina's Comments on Final Results of Remand Redetermination at 4, Sept. 8, 2020, ECF No. 93 ("Trina's Br.").

[10] For example, even though the Maersk data indicates that it is "dry", it does not indicate that it is not also for hazardous goods. There is no evidence on the record to support a finding that these classifications are mutually exclusive, which is what Commerce seems to suggest.

Consol. Court No. 18-00176                                                                    Page 14

Maersk data.  See Final Decision Memo at 30; compare Trina's Surrogate Value Freight Submission at Exs. 2–3 (showing the routes covered by the Xeneta data), with Petitioner's Submission of Surrogate Values and New Factual Information at Ex. 1, CD 417-426, bar code 3636213-01 (Nov. 2, 2017) ("SolarWorld's Surrogate Value Freight Submission") (showing the routes covered by the Maersk data).  Commerce's practice is to choose data that is specific to the input in question.  The input here is freight.  Taken together, the two datasets seem to indicate that a freight rate is a function of not only the container, but also the route.  See generally SolarWorld's Surrogate Value Freight Submission; Trina's Surrogate Value Freight Submission.  Commerce's choice of the Maersk data over the Xeneta data ignores the lack of two routes used by Trina in the Maersk data.  See Final Decision Memo at 30; compare Trina's Surrogate Value Freight Submission at Exs. 2–3 (showing the routes covered by the Xeneta data), with SolarWorld's Surrogate Value Freight Submission at Ex. 1 (showing the routes covered by the Maersk data).  It may be that Commerce can extrapolate missing route information from the information it has, but if it can do so, and is doing so, it should say so and say why doing so is reasonable.[11]

---

[11] In the Final Decision Memo, Commerce found that it was reasonable to rely on the Maersk data despite the missing route information because of its concern that for the Xeneta data, it could not itemize the handling charges, which would lead to double counting of this charge when Commerce calculated Trina's net U.S. price. See Final Decision Memo at 31. Although Commerce now concedes that double counting is not a concern with the Xeneta data because it does exclude handling charges, it does not explain why it continues to be reasonable to extrapolate the missing route information in the Maersk data even though Trina raised this issue again in its comments. See generally Remand Results; Trina's Br. at 12.

Second, Commerce should also address the comparative representativeness of the two data sets. Although it is reasonable for Commerce to choose price quotes over broad data sets in some circumstances, it is not clear to the court why doing so here is reasonable. According to Commerce, the Maersk data here comprises of 32 price quotes for various port to port combinations "on a few days in the POR." Final Decision Memo at 31. There is no explanation of how the days were chosen and why some days are relied on more heavily than others. See, e.g., SolarWorld's Surrogate Value Freight Submission at Ex. 1 (there are 15 price quotes from August 5, 2016 and there is one price quote from February 2, 2016). Nor is there any explanation why some port to port combinations have 3 quotes, see, e.g., id. (3 price quotes for Shanghai to Houston), while other port to port combinations have 1 quote. See, e.g., id. (1 price quote for Shanghai to Jacksonville). It may be that the days of the quotes and the number of quotes for each port-to-port combination provides for a representative selection, but Commerce has not explained that it does. Commerce has acknowledged that the Xeneta data "cover the entire POR" and that "methodology used in compiling the Xeneta data indicates that Xeneta gathers several hundred thousand rates per month and that before releasing any market information, a minimum of 4 rates, per route, per day, per equipment, is required." Final Decision

Memo at 31. Given the paucity, as well as the randomness of the selection, of quotes for the Maersk data, some explanation of Commerce's reasoning is warranted.[12]

The differences in the representativeness of the data extend not just to the selection of specific days and routes, but to the volume of the data supplied, and how it compares to what Trina actually shipped. According to Trina, the Maersk price quotes represent 32 percent of the quantity of shipments by Trina.[13] Conversely, the Xeneta data reflects a broad market average for the entire POR of all the routes used by Trina. See Trina's Surrogate Value Freight Submission at Exs. 1–3. It covers all of Trina's shipments. See id. Of course, it is not the court's role to choose the best information available, it is only to ensure that Commerce's choice was reasonable. See Fujitsu Gen. v. United States, 88 F.3d 1034, 1043 (Fed. Cir. 1996) ("To survive judicial scrutiny, an agency's construction need not be the only reasonable interpretation or even the most reasonable interpretation."). But without further

---

[12] Commerce addresses this representativeness problem in the final results by concluding that the inability to deduct handling charges in the Xeneta data nonetheless renders the Maersk data preferable. See Final Decision Memo at 31. Although it now concedes its error with respect to handling charges in its remand redetermination it does not revisit this acknowledged representativeness flaw except to say that the broadness of the Xeneta data is undermined by the conclusion that it may include rates for refrigerated or hazardous goods. See Remand Results at 4–17.

[13] Of the total quantity that Trina shipped, Trina calculated that there is no Maersk data available for 68 percent of that total. See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the [PRC]: [Trina's] Case Brief [for 2015-2016 Admin. Review] at Enclosure 3, CD 483, bar code 3672048-01 (Feb. 12, 2018). Commerce does not specifically address this assertion, but rather rests on the broad proposition that breadth of information alone is not preferable when, according to commerce, the Xeneta price quotes are not as specific as the Maersk. See, e.g., Remand Results at 8, 16.

Consol. Court No. 18-00176 Page 17

explanation, and in light of record evidence as to the quantity of Trina's sales represented by the two potential data sources, the court cannot say that Commerce's choice was reasonable.

Finally, Commerce bases its remand determination on its assumption that the Xeneta data includes refrigerated or hazardous shipping rates. See Remand Results at 6. Yet, nowhere does Commerce address an obvious implication of such an assumption. One would expect that the inclusion of refrigerated or hazardous shipping rates would render the Xeneta freight rates more expensive than shipping rates that did not include refrigerated or hazardous containers. Indeed, Trina made this argument to the agency. See Pl. Trina's Comments on Final Results of Remand Redetermination at 8–9, Sept. 8, 2020, ECF No. 93 ("Trina's Br.").[14] Commerce

---

[14] Trina states:

> [T]hat the Xeneta freight rates are significantly lower than the Maersk freight rates undermines Commerce conclusion that the Xeneta data includes rates for shipping refrigerated and hazardous cargo and the Maersk data does not. Considering the energy required to control the temperature of a container and the special handling required to convey hazardous cargo, it is reasonable to expect that a 40-foot [high cube] refrigerated container or a 40-foot[] [high cube] container for shipping hazardous cargo would be more expensive than a 40-foot [high cube] dry container. Yet, the per-container Maersk rates, with port-to-port costs ranging from $9,756 to $18,134 per container, are significantly higher than the Xeneta rates ranging from $893 to $4458 per container. If Commerce's finding that the Xeneta dataset might include rates for refrigerated and hazardous cargo and Maersk dataset does not include such rates were true, then the opposite should be expected. That Commerce ignores this fact further demonstrates the absence of any evidentiary basis for its conclusion.

Trina's Br. at 8 (citations omitted).

Consol. Court No. 18-00176 Page 18

further assumes that the Maersk data does not include rates for shipping refrigerated or hazardous items. See Remand Results at 6. And yet, not only is the Maersk data reflective of rates much higher than the Xeneta data, compare Trina's Surrogate Value Freight Submission at Ex. 2 (summarizing the Xeneta freight rates), with SolarWorld's Surrogate Value Freight Submission at Ex. 1 (summarizing the Maersk freight rates), but Trina claims that the Maersk data is reflective of rates much higher than Maersk data from the prior review.[15] See Remand Results at 11; Trina's Br. at 6–7. It may be that the illogical implications of Commerce's assumptions can be perfectly explained by factors known to Commerce and not known to the court. If

---

[15] Commerce purports to address this issue, stating that:

> Trina contends that the average per-container Maersk rates are significantly higher than the Xeneta rates, possibly because the rates are for shipping hazardous, specialty, or refrigerated goods, and that the Maersk rates are anomalous when compared to Maersk ocean freight rates in prior segments of the proceeding. We disagree. First, the record clearly demonstrates that the Maersk rates are for shipping electronic goods, not hazardous, specialty, or refrigerated goods. Second, the Court directed Commerce to explain why we find that the Maersk rates are more specific to Trina's experience than Xeneta rates and we have done so above. Trina has cited to nothing on the record demonstrating that the Maersk rates were miscalculated or otherwise inaccurate. Commerce has a long history of relying on Maersk ocean freight rates and as the Court has stated, 'given Maersk's prominent position in the shipping market, Commerce properly considered the Maersk data to be a reliable world market price.' Thus, Commerce has no reason to doubt the reliability or accuracy of the Maersk data.

Remand Results at 15 (citations omitted). This explanation falls short. Commerce does not offer any reason for the price discrepancy between the Maersk data for this review and the Maersk data from the prior review.

that is the case Commerce should further explain, or it should reconsider its determination.

## II.    Adjusting Trina's Net U.S. Price

When calculating the dumping margin, Commerce is statutorily required to increase the U.S. Price by the amount of any CVD imposed on the subject merchandise to offset an export subsidy. See 19 U.S.C. § 1677a(c)(1)(C). On remand, Commerce increases Trina's U.S. price by the amount of the CVD imposed on the Credit Program in accordance with the court's instruction. See Remand Results at 19.

As explained by the Court of Appeals for the Federal Circuit, that Commerce uses AFA to reach a decision to countervail a program "does not obviate Commerce's obligation to make the 'applicable determination'" and to support its determination with substantial evidence. Changzhou Trina Solar Energy Co. v. United States, Appeals No. 20-1004 at 16–17 Fed. Cir. Sept. 3, 2020) ("Changzhou II") (citations omitted); see also 19 U.S.C. §§ 1677e(a), 1671, 1677(5), (5A), 1516a(b)(1)(B)(i). Based on the fact that the Credit Program provides loan support through export buyer's credits, it is reasonable for Commerce to conclude in this proceeding that the Credit Program was determined to be specific based on export contingency—in fact, Commerce could only conclude that the Credit Program is an export subsidy. Changzhou I, 44 CIT __, Slip Op. 20-64, at 13–14 (May 13, 2020). Commerce's reliance on AFA does not undermine a finding that the Credit Program was an export subsidy.

See Changzhou II, Appeals No. 20-1004 at 16–17. As such, Commerce's determination is sustained.

## CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Commerce's decision to continue to rely on the Maersk data as a surrogate value is remanded for further consideration; and it is further

**ORDERED** that Commerce's decision to increase Trina's net U.S. price is sustained; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 30 days to file their replies to comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 14 days thereafter to file the Joint Appendix; and it is further

**ORDERED** that Commerce shall file the administrative record within 14 days of the date of filing of its remand redetermination.

                                                /s/ Claire R. Kelly
                                                Claire R. Kelly, Judge

Dated:      January 4, 2021
              New York, New York