A-570-979
Remand
Slip Op. 21-2
POR: 12/1/2015 – 11/30/2016
**Public Document**
E&C/OIV: JDP

*Changzhou Trina Solar Energy Co., Ltd., et al. v. United States*
Court No. 18-00176, Slip Op. 21-2 (CIT January 4, 2021)

FINAL RESULTS OF REMAND REDETERMINATION
PURSUANT TO COURT REMAND

**I. SUMMARY**

The Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the second remand order of the U.S. Court of International Trade (the Court), issued on January 4, 2021, in *Changzhou Trina Solar Energy Co., Ltd. et al. v. United States*, Court No. 18-00176, Slip Op. 21-2 (CIT January 4, 2021) (*Trina II*). The remand concerns the final results in the fourth administrative review of the antidumping duty (AD) order on crystalline silicon photovoltaic cells, whether or not assembled into modules (solar cells), from the People's Republic of China (China) covering the period of review (POR), December 1, 2015, through November 30, 2016.[1]

In the first remand order, *Changzhou Trina Solar Energy Co., Ltd. et al.*, Court No. 18-00176, Slip Op. 20-64 (CIT May 13, 2020) (*Trina I*), the Court directed Commerce to reconsider or further explain its surrogate value selection for Changzhou Trina Solar Energy Co., Ltd.'s (Trina)[2] ocean freight and found that Commerce's failure to adjust Trina's U.S. prices to account

---

[1] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 FR 35616 (July 27, 2018) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[2] In the *Final Results*, Commerce treated the following six companies as a single entity: Changzhou Trina Solar Energy Co., Ltd./Trina Solar (Changzhou) Science & Technology Co., Ltd./Yancheng Trina Solar Energy Technology Co., Ltd./Changzhou Trina Solar Yabang Energy Co., Ltd./Turpan Trina Solar Energy Co., Ltd./Hubei

for a countervailed Export Buyer's Credit Program (EBCP) is contrary to law.[3]  In the first remand results, Commerce continued to value Trina's ocean freight expenses with data from Maersk Line (Maersk) rather than data from Xeneta XS (Xeneta).  Commerce increased Trina's U.S. prices by the amount of countervailing duty imposed to offset the export subsidy provided by the Ex-Im Bank of China's EBCP and recalculated Trina's dumping margin accordingly.

In its second remand order, the Court directed Commerce to reconsider or further explain its surrogate value selection for Trina's ocean freight expenses and sustained Commerce's adjustment of Trina's U.S. prices to account for the Ex-Im Bank of China's EBCP.[4]  As set forth in detail below, Commerce has valued Trina's ocean freight with data from Xeneta rather than data from Maersk.

On March 3, 2021, Commerce released its draft redetermination to interested parties and provided them with an opportunity to comment on the Draft Remand.[5]  On March 12, 2021, JA Solar Technology Yangzhou Co., Ltd., Shanghai JA Solar Technology Co., Ltd. and JingAo Solar Co., Ltd. (collectively, "JA Solar"),[6] submitted comments on the Draft Remand.  We have addressed JA Solar's comments below.

## II.   REMANDED ISSUE

In the underlying review, Commerce valued Trina's ocean freight expenses with data from Maersk, rather than data from Xeneta, based primarily on two factors.  First, Commerce determined that using the Maersk data prevented double counting of U.S. brokerage and handling expenses because Commerce concluded that the Maersk data excluded U.S. brokerage

---

Trina Solar Energy Co., Ltd./ Trina Solar (Hefei) Science and Technology Co., Ltd.  *See Final Results*, 83 FR at 35618 and IDM at 1.
[3] *See Trina I* at 18, 22.
[4] *See Trina II*.
[5] *See* Memorandum, "Draft Results of Remand Redetermination, " dated March 3, 2021 (Draft Remand).
[6] *See* JA Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the People's Republic of China: Comments on Draft Results of Remand Redetermination," dated March 12, 2021.

and handling expenses, while the Xeneta data did not, and Trina paid for brokerage and handling expenses separately from ocean freight. Hence, Commerce sought a surrogate value for ocean freight expenses that did not include brokerage and handling expenses. Second, Commerce found that the Maersk rates were more specific to solar panels because they were rates for shipping electronic goods, which would include solar panels, in non-refrigerated containers while the Xeneta rates were not specific to any product but appeared to be average rates for shipping all types of goods, regardless of the whether the good required refrigeration or special handling requirements (such as would be required for hazardous goods).[7]

However, the Court identified record evidence that the Xeneta data excluded handling charges.[8] Moreover, the Court held that Commerce did not cite record evidence to support its conclusion that electronic goods, such as solar panels, require special handling or special containers, or incur special charges, such that the Maersk rates for electronics would be more specific to solar panels than the rates derived from the Xeneta data.[9] The Court stated that at least with regard to specificity, the facts cited by Commerce did not favor one surrogate value data source over the other. Specificity aside, the Court stated that both the Maersk and Xeneta datasets equally satisfy Commerce's surrogate value selection criteria of tax exclusivity, contemporaneity, and public availability. The Court also noted that Commerce acknowledged that the Xeneta rates appear to be based on a pool of data larger than the 32 Maersk rates on the record.[10]

---

[7] *See Final Results* IDM at 29-31.
[8] *See Trina I* at 21 (citing Trina's Letter, "Response to Request for International Freight Surrogate Values," dated July 17, 2017 (Trina's Surrogate Value Submission) at Exhibit 3).
[9] *See Trina I* at 22.
[10] *See Trina I* at 20 (citing *Final Results* IDM at 31).

3

The Court remanded the issue of valuing ocean freight expenses to Commerce to either reconsider or further explain why its determination to value Trina's ocean freight expenses with data from Maersk, rather than data from Xeneta, is reasonable given that one of the reasons for selecting the Maersk data appears incorrect and a key specificity argument relied on by Commerce in selecting the Maersk data is unsupported by the record.

In the first remand results, Commerce continued to value Trina's ocean freight expenses with data from Maersk. While Commerce agreed with the Court that there is enough of an indication on the record that brokerage and handling expenses were excluded from the Xeneta rates,[11] it continued to find Maersk data preferable to Xeneta data in valuing ocean freight expenses because the Maersk shipping rates are more specific to Trina's experience than the Xeneta rates. Commerce found that Maersk requires parties to identify whether the goods they want to ship are hazardous and/or require refrigeration,[12] and to identify the type of product being shipped.[13] Commerce reasoned that the types of shipping containers and equipment used can affect shipping costs. The record shows that the Maersk rates are for shipping electronic goods,[14] which would include solar panels, in 40 foot HC dry containers, the exact type of container used by Trina,[15] while the Xeneta rates are not for shipping any specific type of product in 40 foot HC containers with no reference as to whether the rates are for dry containers.

---

[11] *See Trina I* at 5 (citing Trina's Surrogate Value Submission at Exhibit 3).
[12] *See* Trina's Submission, "Rebuttal to Petitioner's Comments on Selection of Surrogate Values," dated November 13, 2017 at Exhibit 1 at page identified as "1/2."
[13] *See* Petitioner's Letter, "New Factual Information," dated November 1, 2018 (Petitioner's Surrogate Value Submission) at Exhibit 1.
[14] *Id.*
[15] *See* Memorandum "Verification of Trina Solar (U.S.) Inc. in the Antidumping Duty Administrative Review of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China," dated January 2, 2018 at Exhibits 6 and 17 (barcodes 3643653-2 and 3643653-13) and Petitioner's Surrogate Value Submission at Exhibit 1.

However, in *Trina II*, the Court held that Commerce's determination that the Maersk rates are more specific than the Xeneta rates, and thus more accurate, is unsupported by substantial evidence.[16] The Court concluded that Commerce cited no evidence that shipping electronics or shipping solar panels is more or less expensive than shipping anything else.[17] While acknowledging that it may be reasonable to infer that Maersk data can be sorted by shipping container while Xeneta data cannot, the Court held that Commerce failed to demonstrate that the Maersk data excluded special charges for refrigerated or hazardous goods shipping containers, which, in part, was why Commerce rejected the Xeneta data.[18] Further, the Court reasoned that underpinning Commerce's argument was an assumption that refrigerated containers and containers for shipping hazardous materials would be more expensive to ship. Yet, the Court noted, the Xeneta rates, which Commerce rejected because they may be based, in part, on shipments of refrigerated or hazardous goods, are lower than Maersk's rates.[19]

The Court also identified evidence that it said detracted from Commerce's selection of Maersk data. First, Maersk data do not cover the full breadth of the shipping routes used by Trina.[20] Second, Maersk data consist of only 32 price quotes covering only a few days in the POR, with nearly half of the price quotes coming from one day of the POR.[21] Meanwhile, the Xeneta data "cover the entire POR," "Xeneta gathers several hundred thousand rates per month," and "a minimum of 4 rates, per route, per day, per equipment, is required."[22] The Court directed Commerce to address the issues it raised with Commerce's decision to continue to rely on the

---

[16] *See Trina II* at 9.
[17] *Id.* at 10.
[18] *Id.* at 11-12.
[19] *Id.* at 17-18.
[20] *Id.* at 14.
[21] *Id.* at 15.
[22] *Id.* (citing *Final Results* IDM at 31).

5

Maersk data as a surrogate to value ocean freight costs incurred by Trina, and remanded Commerce's determination for further consideration.

In light of the Court's second remand order, we have reconsidered our determination. We do not have rates for shipping electronic goods and other nonhazardous and nonrefrigerated goods on the record to demonstrate how the rates for shipping electronics and non-electronics differ, as requested by the Court. Moreover, we have no evidence, aside from what we have already presented to the Court, to demonstrate that the Maersk data exclude rates for shipping hazardous or refrigerated goods while the Xeneta data may not. Therefore, we reexamined the Maersk and Xeneta data.

Commerce evaluates potential surrogate values based on their: (1) specificity to the input; (2) tax and import duty exclusivity; (3) contemporaneity with the period under consideration; (4) representativeness of a broad market average; and (5) public availability.[23] Both the Maersk and Xeneta datasets equally satisfy Commerce's criteria of tax exclusivity, contemporaneity, and public availability. However, Xeneta data are both more specific to the shipping routes used by Trina (Xeneta rates cover the freight routes used by Trina while Maersk data only cover approximately 30 percent of the routes used by Trina)[24] and present a broader market average than the Maersk data (Xeneta data include thousands of actual shipments covering every day of the POR while the Maersk data comprise 32 price quotes, with 15 of the quotes from only one day of the POR). Therefore, disregarding the lack of product information in the Xeneta data and our prior concerns regarding types of shipping containers used, we have determined that the

---

[23] *See Policy Bulletin 04.1: Non-Market Economy Surrogate Country Selection Process* (March 1, 2004).
[24] *See* Trina's Surrogate Value Submission at Exhibits 2 and 3; *see also* Petitioner's Surrogate Value Submission at Exhibit 1; *see also* Trina's U.S. sales database submitted as Bar Code 3626443-05 (trina_us04.sas7bdat) on October 5, 2017.

Xeneta data represent the best available information with which to value Trina's ocean freight expenses.

**Interested Parties' Comments:**

JA Solar agrees with Commerce's determination in the Draft Remand, and asserts that Commerce should maintain this determination in the final remand redetermination filed with the Court. Also, JA Solar maintains that Commerce should base its separate rate on the dumping margin calculated for Trina in the final remand redetermination.

No other parties commented on the Draft Remand.

**Commerce's Position:**

Consistent with our position, and for the reasons explained in the Draft Remand, for this final remand redetermination, we calculated Trina's weighted-average dumping margin using Xeneta data to value Trina's ocean freight expenses. We assigned the dumping margin that we calculated for Trina to the separate rate respondents participating in this litigation.

## III. FINAL RESULTS OF REDETERMINATION

In accordance with the Court's remand order, Commerce has conducted an analysis of the position that it was instructed to reconsider or further explain. For the reasons explained above, we have reconsidered our reliance on the Maersk data to value Trina's ocean freight expenses and have determined that the Xeneta data represent the best available information with which to value Trina's ocean freight expenses.

After making this change, we calculated a dumping margin of 5.08 percent for Trina.[25] Consequently, the rate applicable to the separate rate respondents participating in this litigation,

---

[25] *See* Draft Remand.

JingAo Solar Co., Ltd., JA Solar Technology Yangzhou Co., Ltd., and Shanghai JA Solar Technology Co., Ltd., is also 5.08 percent.

4/5/2021

X _____

Signed by: CHRISTIAN MARSH

_____
Christian Marsh
Acting Assistant Secretary
 for Enforcement and Compliance